JOHN L. JONES, *an infant, etc.*

*v.*

JOHN F. AMBROSE

(No. 9795)

Submitted April 10, 1946. Decided April 30, 1946.

*James M. Mason, III,* and *Harry H. Byrer,* for plaintiff in error.

*Geo. M. Beltzhoover, Jr., Haymond Maxwell, Sr.* and *Maxwell & Young,* for defendant in error.

KENNA, PRESIDENT:

Ernest D. Jones, as the next friend of John L. Jones, an infant, brought this action of trespass on the case in the Circuit Court of Jefferson County seeking to recover damages in the amount of $50,000 from the defendant, John F. Ambrose, by reason of the loss of his ward's right leg necessarily occasioned by an injury received by him in a motor vehicle accident on the 15th day of July, 1944, on State Route 22 between Zoar and Whittington's Cross-roads alleging that the negligence of the defendant consisted of the reckless and careless operation of a truck owned by him that had on its floor an iron bar which extended eight and one-half inches beyond the left side of the truck and was fastened by bolt to the floor. From a verdict and judgment in the amount of $20,000 a writ of error was granted upon the petition of the defendant below. The assignments of error are ten in number: (1) That a verdict in favor of the defendant should have been directed because the plaintiff was shown to be guilty of contributory negligence as a matter of law; (2) that the court erred in refusing a mistrial on the defendant's motion based upon the fact that the plaintiff's uncle was

then the Clerk of the Circuit Court of Jefferson County and that he and plaintiff's attorney had been guilty of gross misconduct to the prejudice of the defendant below; (3) that the court erred in permitting Roy Harris and Homer Harris to testify concerning a statement made by Walter Marlowe as to a statement alleged to have been made by the driver of defendant's truck to the effect that Marlowe had warned him, Staubs, shortly before the accident that he was driving too fast; (4) that the court erred in permitting the defendant to be asked on cross-examination whether he had heard, a number of years before the accident, that his driver, Staubs, had been charged with reckless driving on a public highway; (5) that the court erred in not granting defendant's motion to allow the jury to view the tractor and two wagons constituting the combination of vehicles upon which the plaintiff was riding; (6) the court erred in granting the instructions offered by the plaintiff with the exception of plaintiff's Instructions Numbers One and Five; (7) the court erred in refusing to give each of the instructions offered by the defendant, Numbers Two, Four, Nine, Twelve, Fifteen, Sixteen, Seventeen and Eighteen; (8) the court erred in overruling the motion of the defendant to set aside the verdict and grant a new trial; (9) the court erred in entering judgment upon the verdict; and (10) the court erred in refusing to set aside the verdict because it resulted from passion, prejudice or other adventitious circumstances and was grossly excessive.

It appears from the testimony that on July 15, 1944, between three and three-thirty in the afternoon, the day being clear and the roads dry, John L. Jones, popularly called "Jackie", a physically well developed boy fourteen years of age, employed by Norval Jenkins as a farmhand, was going from the Jenkins farm to another farm operated by Jenkins known as the Kephart farm, a distance of several miles. With other employees of Jenkins he was riding on an empty hay wagon, the second of two

drawn by a tractor. The tractor was ten feet long and seven feet, eight inches wide, and the length of the two hay wagons, including their tongues, was twenty-four feet and twenty-two feet, ten inches. Each wagon was six feet, eight inches wide, or one foot more narrow than the tractor. That the tractor was making a speed of between three and five miles per hour is uncontroverted. At the time of the accident the tractor was going west between a lane leading from the highway into the farm of C. L. Robinson on the south and a lane into the farm known as the Kephart place on the north, the highway between the two lanes being straight. The lanes are shown to be one hundred and sixty-five feet apart. To the west of the Kephart Lane there is a bend or curve in the highway at which the visibility of the highway is reduced to approximately two hundred feet, the percentage of the curve not appearing.

The tractor was being driven by an employee of Jenkins named Roy Harris. Standing on the first wagon were his son, Homer Harris; and a man by the name of Ritter, while seated side by side on the left side of the "shelving" of the second wagon, with their lower legs hanging over the side, were Harry Nicodemus to the front, Jackie Jones second and William Burner last.

The testimony of the plaintiff is to the effect that the two ton truck of the defendant operated by Alfred Staubs, defendant's employee, and carrying Walter Marlowe, another employee, as a passenger, was proceeding east at a speed of between thirty and thirty-five miles per hour. Before it reached the tractor it was seen to be weaving from side to side on the highway. After it had passed a bend in the road and at a point ninety-seven or one-hundred feet east of the Kephart Lane, where the road had been straight for at least that distance, and after having passed the tractor, it swerved to the left beyond the middle of the road, causing an iron bar extending beyond the edge of the truck eight and one-half inches to strike the plaintiff's lower right leg, injuring him so

that a necessary amputation followed. Nicodemus, together with Jones and Burner, was sitting with his legs hanging over the edge of the hay wagon "shelving" and, of the three, was closest to the approaching truck with Jones next. A second before the plaintiff was struck Nicodemus rolled back, lifting his legs and thus avoiding injury. The six persons who were riding on the hay wagons and the tractor testified that the tractor and the wagons were proceeding on the right hand side of the highway's center and corroborate the plaintiff's version of the accident to the extent their observations permitted. Burner, who was seated beyond the plaintiff and to the rear of the wagon, and the plaintiff were both knocked from the wagon to the highway, the iron bar on the truck not striking Burner. The tractor was twelve inches wider than the hay wagons. Neither the tractor nor either hay wagon was struck.

Staubs' version of the occurrence is that it took place when the tractor was within approximately fifteen feet from the entrance of the Kephart Lane which it was about to enter, and for that reason had turned to the left of the center of the road in order that the hay wagons, with an overall length of between forty-six and forty-seven feet, could clear the corner of the fence on the eastern side of Kephart's Lane. Staubs, the driver of the truck, states his speed was between eighteen and twenty miles per hour and he first saw the tractor when he was within ten feet of it; that in order to avoid striking it he turned his truck off the road to the right onto a steep bank upon which he could not stop without turning the truck over and after he had passed the tractor and the wagons without striking them he thought that an accident had been avoided until in his driving mirror he saw the Jones boy and Burner on the road and that then he stopped, turned his truck around, and went back to offer such assistance as he could. Marlowe, also an employee of Ambrose, who was with Staubs in the truck, in the main corroborates Staubs, although his testimony is not clear.

It will be observed that in addition to other conflict in the testimony for the plaintiff and that for the defendant, the plaintiff's testimony is that the accident took place at approximately one-hundred feet before the tractor had reached the Kephart Lane and consequently that at the point of the accident there was no reason for it to occupy the road to the left of center in order to enter that lane. The testimony of the defendant is that the tractor stopped to the left of the road's center line within sixteen feet of the entrance to the Kephart place. The defendant contends that it was necessary for the tractor to cut to the left in order that the wagons it was pulling could clear upon entering the Kephart Lane.

On the first assignment of error we cannot say that the plaintiff was guilty of contributory negligence as a matter of law. Two men of mature years were doing as he was doing. The width of the tractor was approximately one foot greater than that of the hay wagons. That means that on a straight road a vehicle which had passed the tractor would also safely pass a person with his lower legs hanging over the edge of the hay wagon's "shelving" unless the legs were unnecessarily extended, which is not shown. Staubs testified that the tractor stopped "in the middle of the road", where it was when he passed it. He also stated that "it was almost ready to turn in the gate". On the defendant's theory the tractor had not started to turn in the gate to the right, therefore the hay wagons would have been no farther to the left than it would have been. The truck cleared the tractor and if it had continued in a straight line it would have cleared the wagons, which were twelve inches more narrow. We are of the opinion that the defendant's proof failed to show that the hay wagons were farther to the left than was the tractor and since, as we have seen, the truck passed the tractor without colliding, the jury was justified in believing that it should also have passed the more narrow hay wagons without accident. We think the question of contributory negligence was properly submitted to the jury.

Assignment two is based upon a very unusual occurrence upon which we have been unable to find a guiding precedent. We are of the opinion that, like other adventitious circumstances, its solution rested within the sound discretion of the trial judge, who, it is to be assumed, was reliably informed concerning the circumstances surrounding the court over which he was presiding. The question concerning the activity of the Circuit Clerk, uncle of the plaintiff, was first raised by the defendant's motion to strike the panel. There is no special showing of prejudice that resulted from the selection of the jury, and we fail to see where prejudice could result as a matter of course from properly drawing the names to constitute a panel from a jury box, in the presence of the trial court. The only other happening that is directly attacked under this assignment occurred when the plaintiff's father was undergoing direct examination and in the course of the questioning the plaintiff's attorney propounded a question that the witness appeared not to understand. It was then that the Circuit Clerk went to the attorneys' table and spoke to counsel. The attorney for the defendant then moved that the jury leave the court room, after which he moved that a mistrial be declared because the Circuit Clerk had "been repeatedly advising and counselling the counsel for plaintiff". The trial judge then stated that he thought it was rather obvious that the Clerk had been advising with counsel for plaintiff, and instructed him not to do it further, but declined to declare a mistrial. The record, with the exception of the statements of the trial court and defendant's counsel, refers to no other like circumstance. We are of the opinion that if the defendant believed that the Clerk should not have acted in the case at bar, he should have called that fact to the trial court's attention in the beginning. The motion to strike the panel indicates that defendant expected difficulty. For good cause shown under Code, 56-9-1, the case, on motion, could have been removed to another circuit. The duties of a Circuit Clerk require his attendance upon the court when in session.

While it is not shown that a member of the jury knew that the plaintiff was a nephew of the Circuit Clerk, it would have been extremely difficult, we believe, for the trial judge to have concealed the existence of a relationship from the members of the trial jury, and if he had instructed the Clerk not to act that fact alone would naturally have attracted attention and provoked discussion, perhaps with more possibility of resultant harm to the defendant. While of course we can see that harm possibly resulted from the course taken by the trial court, that mere possibility is not sufficient to ground a mistrial or a reversal. The statute referred to does not authorize the trial judge to remove a case from his court on his own volition.

The third assignment of error reads as follows:

"The Court erred in permitting the witnesses Roy Harris and Homer Harris to testify with respect to a hearsay statement made by the witness Marlowe as to *a statement alleged to have been made by the driver of the defendant's truck, Staubs, to the effect that* Marlowe had warned Staubs shortly before the accident that he was driving too fast; such statement being 'double hearsay' ". (Italics ours).

There is no evidence in this record concerning a statement made by Staubs to the effect that Marlowe had warned him, Staubs, shortly before the accident, that he was driving too fast. The two Harrises were permitted to state that they had heard Marlowe say immediately following the accident that he, Marlowe, had told Staubs just before the accident that he was driving too fast. His statement was admitted by the trial court on the theory that it was a part of the *res gestae* due to the fact that Marlowe was an actor in the transaction that formed the basis of the litigation before the court, and that in point of time Marlowe's statement to Staubs constituted a part of the principal event. In this we find no assigned error.

The fourth assignment of error is based upon the showing that before the accident Ambrose knew that Staubs, the driver of the truck, some eighteen years be-

fore the trial or before the accident, had been convicted and sentenced for reckless driving. This testimony was offered and admitted because Ambrose, employer of Staubs, had testified that of the five or six men he employed as drivers Staubs was the most reliable and careful. The proof was very remote, but since the evidence of Ambrose was necessarily based upon his opinion as to what constituted a careful driver, we believe that his being informed concerning Staubs' previous conviction was admissible, and that evidence relating thereto did not constitute reversible error.

The fifth assignment of error as to refusing a second view, the court having granted one and it having been executed, for the purpose only of seeing the tractor and the hay wagons fastened together as they were at the time of the accident, and demonstrating that it was not possible for them to enter the Kephart Lane without going to the wrong side of the road, is not well taken. The jury had seen the tractor and one of the hay wagons upon the executed view and, eliminating what we regard as an obviously improper demonstration asked for by the defendant, there was plainly no violation of the trial judge's discretion in declining the second view.

Assignment six is based upon instructions given on behalf of plaintiff and assignment seven relates to those offered by defendant that were refused.

Although we have examined all of the instructions given on behalf of the plaintiff, since plaintiff's Instructions Number Seven and Number Ten are the only ones upon which stress is laid in the petition, we will confine our discussion to them.

Instruction Number Seven is attacked because it tells the jury that in the event they find for the plaintiff they shall consider in returning their verdict his impaired ability to earn a living after he has become twenty-one years of age. The objection is that the instruction treats as a matter of established fact the impairment of plaintiff's earning capacity by the loss of his right leg

approximately two-thirds of the way up the thigh. We do not believe that that constituted error, because the loss of a leg is a permanent handicap in any occupation. It would require more exertion to overcome this disability and this fact is equivalent to an impairment of earning capacity. Of course the extent of that impairment varies according to the occupation. A person acting as a legal adviser would be, perhaps, slightly impaired. From every indication young Jones expects to earn his future living on a farm. Certainly it would be unfair to him to say to a jury that it must regard his earning capacity as being unimpaired. In the majority of like cases, if not in all, that statement would be untrue. We are not here dealing with earning capacity as it is treated in workmen's compensation cases.

Plaintiff's Instruction Number 10 reads as follows:

"In considering how far the plaintiff has been guilty of contributory negligence it is proper for the jury to consider his age, experience and understanding, for the law requires of a child only such care and caution as a person of his age and discretion would naturally use."

It is objected to because it speaks of the plaintiff as a child of whom is required only such care and caution as a person of his age would naturally use. An examination of the record fails to disclose that the defendant below objected to this instruction due to the fact that it rested a recovery upon the doctrine of comparative negligence. Therefore that point of error will not be considered. Speaking of the plaintiff as a child, we think, is technically correct. He sues as an infant by his next friend and though there is a legal distinction, as between the two words we do not believe that in an instruction the difference is enough to constitute error. As to the plaintiff's experience and understanding, that perhaps is a trifle expletive, but as such could result in no prejudice. The plaintiff went on the stand and we believe demonstrated that he was a boy of unusual capacity. The

jury saw him and heard him examined and cross-examined. We believe the defendant would have been entitled to an instruction, if he had wished, upon the question of the plaintiff being capable of more care and caution than his age would indicate. We find no error in the giving of the plaintiff's instructions.

The seventh assignment of error deals with the refusal of eight instructions tendered on behalf of the defendant. To discuss in detail the eight instructions involved, as well as the evidence upon which they are based, is impracticable. Therefore we must content ourselves by saying that they have been carefully examined and compared with the instructions given on behalf of the defendant and that we see no error in assignment seven.

Assignments eight, nine and ten are all general and are predicated, we believe, upon one or more of the assignments hereinbefore discussed. We do not believe that the trial court erred in not sustaining the motion to set aside the verdict and grant a new trial, or in entering judgment upon the verdict, or in declining to set aside the verdict because it found excessive damages in favor of the plaintiff. It is not our place to sentimentalize beyond saying that the loss of a leg to a boy fourteen years of age is a lasting tragedy, and that in this instance the plaintiff's mental and physical sufferings were undoubtedly acute. For three days they undertook to save his leg with according treatment. His leg then developed gaseous gangrene and an amputation, followed by treatments indicated, resulted. Later, in preparing to use an artificial leg, he will be obliged to undergo another operation to remove more bone in order to leave room for a padded stump. There is no scale by which damages of this sort can be weighed, and what seems otherwise to be a just verdict cannot be nullified unless the excess of its amount is plain. We believe this is not.

For the foregoing reasons the judgment of the Circuit Court of Jefferson County is affirmed.

*Affirmed.*